# Exhibit 1

# UNILATERAL NON-DISCLOSURE AGREEMENT

This Non-Disclosure Agreement, dated as of 21 April, 2016, (the "Effective Date") governs the disclosure of information by Orochem Technologies, an IL-based company, with its principal place of business at 340 Shuman Blvd., Naperville, IL 60540 (the "Company") to the current employees of Folium Biosciences (previously Whole Hemp Company), a Colorado-based company with its principal place of business at 828 Wooten Road, Colorado Springs, CO 80915 (the "Recipients") for the purpose of exploring a potential business relationship (the "Purpose").

1. **Confidential Information.** As used herein, "Confidential Information" shall mean any and all technical and non-technical information that Company provides Recipient, whether in graphic, electronic, written or oral form, and including but not limited to patent applications and other filings, trade secrets, and any other proprietary information, as well as any ideas, techniques, sketches, drawings, works of authorship, models, inventions, know-how, processes, algorithms, software programs, documents, and formulae related to the current, future, and proposed products and services of Company, and also any information concerning any research, experimental work, development, design details and specifications, engineering, financial information, purchasing, customer lists, investors, employees, business and contractual relationships, business forecasts, sales and merchandising, or marketing plans of Company and any information Company provides regarding third parties.

2. **Non-Disclosure.** Recipient agrees that at all times and notwithstanding any termination or expiration of this Agreement it will hold in strict confidence and not disclose to any third party any Confidential Information except as approved in writing in advance by Company, and will use the Confidential Information for no purpose other than the Purpose. Recipient shall only permit access to Confidential Information to those of its employees or authorized representatives having a need to know and who have signed confidentiality agreements or are otherwise bound by confidentiality obligations at least as restrictive as those contained herein.

3. **Notice of Disclosure.** Recipient shall immediately notify Company upon

discovery of any loss or unauthorized disclosure of the Confidential Information.

4.  **Use of Confidential Information.** All Confidential Information is provided "AS IS," without any warranty of any kind. Recipient recognizes and agrees that nothing contained in this Agreement shall be construed as granting it any property rights, by license or otherwise, to any Confidential Information, or to any invention or any patent, copyright, trademark, or other intellectual property right that has issued or that may issue, based on such Confidential Information. Recipient shall not make, have made, use or sell for any purpose any product or service or other item using, incorporating or derived from any Confidential Information, nor make any filings or registrations based on the receipt or use of the Confidential Information, absent separate written approval of Company.

5.  **No Reproduction.** Confidential Information shall not be reproduced in any form except as required to accomplish the intent of this Agreement. Any reproduction of any Confidential Information shall remain the property of Company and shall contain any and all confidential or proprietary notices or legends which appear on the original.

6.  **Term.** This Agreement shall terminate three (3) years after the Effective Date, or may be terminated by either party at any time upon thirty (30) days written notice to the other party; provided, however, Recipient's obligations under this Agreement shall survive termination of the Agreement between the parties and shall be binding upon the Recipient's heirs, successors and assigns. Upon termination or expiration of the Agreement, or upon written request of Company, Recipient shall promptly return to the Company all documents and other tangible materials representing the Confidential Information and all copies thereof.

7.  **Miscellaneous.**

Confidential                    Page 2 of 5



**7.1. Amendments and Waivers.** Any term of this Agreement may be amended or waived only with the written consent of the Company.

**7.2. Sole Agreement.** The Agreement sets forth the complete, exclusive and final statement of the agreement between the parties as to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, negotiations and discussions, whether oral or written, between the parties regarding such subject matter.

**7.3. Notices.** Any notice required or permitted by this Agreement shall be in writing and shall be deemed sufficient upon delivery, when delivered personally or by overnight courier or sent by email or fax (upon customary confirmation of receipt), or forty-eight (48) hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address or fax number as set forth on the signature page or as subsequently modified by written notice.

**7.4. Choice of Law.** The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of IL, without giving effect to the principles of conflict of laws.

**7.5. Severability.** If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.



7.6. **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together will constitute one and the same instrument.

7.7. **Assignment.** Recipient will not assign or transfer any rights or obligations under this Agreement without the prior written consent of Company. Any such assignment without prior consent shall be null and void from the beginning. Recipient shall not export, directly or indirectly, any technical data acquired from Company pursuant to this Agreement or any product utilizing any such data to any country for which the U.S. Government or any agency thereof at the time of export requires an export license or other governmental approval without first obtaining such license or approval.

7.8. **Dispute Resolution.** Recipient agrees that upon Company's request, all disputes arising hereunder shall be adjudicated in the state and federal courts having jurisdiction over disputes arising in DuPage County, IL, and Recipient hereby agrees to consent to the personal jurisdiction of such courts.

7.9. **Advice of Counsel.** EACH PARTY ACKNOWLEDGES THAT, IN EXECUTING THIS AGREEMENT, SUCH PARTY HAS HAD THE OPPORTUNITY TO SEEK THE ADVICE OF INDEPENDENT LEGAL COUNSEL, AND HAS READ AND UNDERSTOOD ALL OF THE TERMS AND PROVISIONS OF THIS AGREEMENT. THIS AGREEMENT SHALL NOT BE CONSTRUED AGAINST ANY PARTY BY REASON OF THE DRAFTING OR PREPARATION HEREOF.

In Witness Whereof, the parties hereto have caused this Non-Disclosure Agreement to be executed as of the Effective Date.



**By Recipient (current employees of Folium Biosciences/Whole Hemp Co.):**

1. _(signature)_ Date: 4/25/16 Print Name: BRAD JONES

2. _(signature)_ Date: 4/25/16 Print Name: Eric Fleming

3. _(signature)_ Date: 5.2.16 Print Name: ZACH JONES

4. _(signature)_ Date: 9/8/16 Print Name: Chris Haley

**By Company:**

_(signature)_ Date: _____ Print Name: ASHA A. OROSKAR

Orochem Technologies, 340 Shuman Blvd., Naperville, IL 60540

Confidential                    Page 5 of 5

# Exhibit 2



# OROCHEM TECHNOLOGIES Inc. BUDGET PROPOSAL
## Dated 10/18/2015 REV 1

### For

### Whole Hemp Company

### MAXPREP SMB for HEMP OIL PURIFICATION



**OROCHEM TECHNOLOGIES INC**
**340 SHUMAN BLVD**
**NAPERVILLE IL 60563**
**TEL: 1-630-210-8300**



**Validity**

Prices are valid for 30 days. Prices are exclusive of any applicable tax or duty, whether present or future.

**Estimated Shipping Terms** Seller shall have title to equipment until it is delivered to Buyer. Buyer shall reimburse Seller for reasonable shipping and insurance costs.

## 14. Terms and Conditions

1) **DEFINITIONS:**

a) Seller: Orochem Technologies Inc

b) Buyer: Whole Hemp Company. (original purchaser)

c) Documentation: This proposal for the sale of the System.

d) System: MAXPREP SMB The system, and/or equipment described in the Documentation.

Terms used in this Agreement which are not defined herein and which are defined by the Uniform Commercial Code of the State of Illinois shall have the meanings contained therein.

2) **GENERAL:** Seller hereby offers for sale to Buyer the System on the express condition that Buyer agrees to accept and be bound by the terms and conditions set forth herein. To the extent of a conflict between these Standard Sales Terms and Conditions and the express terms set forth in the Documentation, the terms set forth in the Documentation shall control. Any provisions contained in any document issued by Buyer are expressly rejected and if the terms and conditions set forth herein differ from the terms in any document issued by Buyer, this document shall be construed as a counter offer and shall not be effective as an acceptance of Buyer's document. In ordering and delivery of the System, the parties may employ their standard forms; provided, however, that nothing in those forms shall be construed to modify or amend the terms of this Agreement. In the event of a conflict between this Agreement and either party's standard forms, this Agreement shall govern.

3) **PRICE AND PAYMENT:** The price shall be as stated in the Documentation, subject to these Standard Sales Terms and Conditions and other terms and conditions as may be stated in the Documentation. Unless otherwise stated in the Documentation:



a)  The price is exclusive of any taxes, tariff, and duties of any kind which either party may be required to pay with respect to the sale of goods described in the Documentation, and Buyer shall be responsible for the payment of all taxes, tariffs and duties related hereto, except for income taxes imposed on Seller;

b)  Sales Tax will be added to the price based upon the System destination unless Tax Exemption or Direct Pay Documentation is provided;

c) Billing terms are (i) twenty percent (50%) advance payment paid by Electronic Funds Transfer (ETF) upon order, (ii) forty percent (40%) when the System is ready for shipment, and (iii) 10 percent (10%) when the System is delivered and installed (if applicable); and

4)     TITLE AND RISK OF LOSS: Risk of loss of the System will pass to Buyer upon delivery of the System by Seller to Buyer's facility; provided, however, that title to any software incorporated within or forming a part of the System shall at all times remain with Seller or the licensor(s) thereof, as the case may be.  Notwithstanding the provisions of the UCC or INCOTERMS, title to the System, and all accessions to or products of the goods, shall remain with Seller until payment in full of the purchase price and of other amounts owing by Buyer.

5)     AVAILABILITY:  Shipment dates (and delivery and installation dates if included in the scope of work description in the Documentation) are not guaranteed, and Seller will not be liable for any loss or damage resulting from any delay in delivery or failure to deliver which is due to any cause beyond Seller's reasonable control.  In the event of a delay due to any cause beyond Seller's reasonable control, Seller reserves the right to reschedule the shipment within a reasonable period of time, and Buyer will not be entitled to refuse delivery or otherwise be relieved of any obligations as the result of such delay.  If any delivery is delayed for more than thirty (30) days beyond the originally scheduled delivery date and such delay is caused by Buyer, Buyer will be subject to storage charges from the scheduled shipment date of two percent (2%) of the sale price per month; and such storage charge shall be due monthly on the first day of each month. Storage by Seller shall be at Buyer's risk and expense.

6)     PERMITS, LICENSES, and FEES:  Buyer shall be responsible, at its sole expense, for all environmental permits, applications, regulatory approvals, and other permits or licenses that may be required for installation and/or operation of the System.



7)    **CHANGES:**  Any changes requested by Buyer after signing the Documentation will be designed and priced by Seller.  No change will be made without receipt of a written change order accepted in writing by Seller.


8)    **ACCELERATION:**  Buyer agrees that Seller, at its discretion, may accelerate and make due and payable all remaining payments if Buyer shall fail to perform any of its obligations hereunder or under the Documentation, including without limitation Buyer's failure to pay any amount when due, subject to any applicable cure periods provided for herein.


9)    **INTELLECTUAL PROPERTY:**  Seller agrees to indemnify and hold harmless Buyer from any and all costs, expenses and damages resulting from any claim of infringement of a United States patent by reason of its use of the System (of Seller's own designs and in the condition supplied and manner contemplated by Seller) or from any suit resulting from any such claim, provided that Buyer promptly notifies Seller of any such claim or the institution of any such suit.  Buyer shall offer Seller full and exclusive right of defense in any such suit to the extent the System is involved therein.  In the event of any such claim or suit, Seller shall have the right, in its sole discretion, to (1) modify or replace the System, or (2) to remove the System and refund the purchase price thereof to Buyer less fifteen percent (15%) for each full year from the date of shipment of the System.  This indemnification shall not apply to: (a) any foreign patents, (b) apparatus designs modified by Buyer or at its request, (c) any process in which the System is not intended to be used, or (d) any product made by Buyer.

Seller's cumulative liability for indemnification under this provision shall not exceed the purchase price of the System.

Buyer agrees to indemnify and hold harmless Seller from any and all costs, expenses and damages resulting from any claim of infringement of a United States patent as a result of Buyer's own designs or from any suit resulting from any such claim, provided that Seller promptly notifies Buyer of any such claim or the institution of any such suit.  Buyer further agrees and acknowledges that the System supplied by Seller contains Sellers' intellectual property.  Buyer agrees that it has no right or license to provide Seller's intellectual property relating to and/or embodied in the System to any third parties, or to use Seller's intellectual property to manufacture or provide (either internally or through the assistance of third parties) a purification system that competes with and/or performs similar functions as the System supplied by Seller.


10)   **LIMITED WARRANTIES:**   Unless otherwise specifically provided for in the Documentation, Seller warrants that the System sold hereunder shall be free from defects



in materials and workmanship for a period of one (1) year from the date of System start-up or eighteen (18) months from date of System shipment, whichever comes first. Corrosion or other chemical action is specifically excluded as a defect covered hereunder. In no event shall Seller have any obligation to make repairs, replacements or corrections required, in whole or in part, as the result of (a) normal wear and tear, (b) accident, disaster or event of force majeure, (c) misuse, fault or negligence of or by Buyer, (d) use of the System in a manner for which it was not designed, (e) external causes such as, but not limited to, power failure or electrical power surges, (f) improper storage and handling of the System or (g) use of the System in combination with equipment or software not supplied by Seller.  If Seller determines that the System for which Buyer has requested warranty services is not covered by the warranty hereunder, Buyer shall pay or reimburse Seller for all costs of investigating and responding to such request at Seller's then prevailing time and materials rates.  If Seller provides repair services or replacement parts that are not covered by this warranty, Buyer shall pay Seller therefor at Seller's then prevailing time and materials rates.  ANY INSTALLATION, MAINTENANCE, REPAIR, SERVICE, RELOCATION OR ALTERATION TO OR OF, OR OTHER TAMPERING WITH, THE SYSTEM PERFORMED BY ANY PERSON OR ENTITY OTHER THAN SELLER WITHOUT SELLER'S PRIOR WRITTEN APPROVAL, OR ANY USE OF REPLACEMENT PARTS NOT SUPPLIED BY SELLER, SHALL IMMEDIATELY VOID AND CANCEL ALL WARRANTIES WITH RESPECT TO THE AFFECTED SYSTEM.

This warranty is limited to the replacement and/or repair, at Seller's option, by Seller of any parts or materials which in Seller's determination are defective; provided that Buyer shall promptly notify Seller in writing upon the discovery of any defect, which notice shall include the product model and serial number (if applicable) and details of the warranty claim. This warranty does not cover any charges by Buyer for replacement of parts, adjustments or repairs, or any other work unless such charges shall be assumed or authorized in advance in writing by Seller.


THE OBLIGATIONS CREATED BY THIS WARRANTY STATEMENT TO REPAIR OR REPLACE A DEFECTIVE PRODUCT SHALL BE THE SOLE REMEDY OF BUYER IN THE EVENT OF A DEFECTIVE PRODUCT.  THERE ARE NO WARRANTIES MADE WITH REGARD TO THE MEDIA, THE SYSTEM OR THE SERVICES TO BE PROVIDED PURSUANT TO THE AGREEMENT OTHER THAN THOSE CONTAINED IN THIS SECTION. ALL OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, ARE HEREBY DISCLAIMED, INCLUDING, WITHOUT LIMITATION, THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE AND ALL WARRANTIES ARISING FROM COURSE OF DEALING OR USAGE OF TRADE.  SELLER DOES NOT WARRANT THAT THE SYSTEM IS ERROR-FREE. ANY ADVICE OR ASSISTANCE FURNISHED BY SELLER IN RELATION TO THE SYSTEM PROVIDED FOR HEREUNDER AND



UNDER THE DOCUMENTATION SHALL NOT GIVE RISE TO ANY WARRANTY OR GUARANTEE OF ANY KIND, AND SHALL NOT CONSTITUTE A WAIVER BY SELLER OF ANY PROVISIONS OF THE DOCUMENTATION OR THESE STANDARD SALES TERMS AND CONDITIONS, UNLESS OTHERWISE AGREED TO IN WRITING.

12)    **LIMITATION OF LIABILITY:**  Notwithstanding any provision to the contrary in this Agreement, the parties hereto agree that in no event shall Seller be liable for any indirect, special, consequential, incidental or punitive damages as a result of a breach of any provision of this contract or for any other claim of any kind arising out of or relating to this Agreement, whether in contract, in tort (including negligence or strict liability) or otherwise, regardless of whether Seller has been informed of the possibility of such damages.  Notwithstanding any provision to the contrary herein, for all losses, damages, liabilities or expenses (including attorney's fees and costs), whether for indemnity or negligence, including errors, omissions or other acts, or willful misconduct, or based in contract, warranty (including any costs and fees for repair, replacement or re-performance of services), or for any other cause of action (individually, a "Claim"; collectively, "Claims"), Seller's liability, including the liability of its insurers, employees, agents, directors, and officers and all other persons for whom Seller is legally responsible, shall not, to the maximum extent permitted by law, exceed in the cumulative aggregate with respect to all Claims arising out of or related to the Agreement, the lesser of (a) the total amount of compensation paid to Seller hereunder and (b) One Million Dollars ($1,000,000).  All Claims of whatsoever nature shall be deemed waived unless made in writing within forty-five (45) days of the occurrence giving rise to the Claim.

13)    **FORCE MAJEURE:**  Notwithstanding any provision to the contrary herein, Seller shall have no liability to Buyer or its affiliates, and shall have the right to suspend performance (including, without limitation, shipments) hereunder, in the event of war, riot, terrorism, accident, explosion, sabotage, flood, acts of God, fire, court order, strike, labor disturbance, work stoppage, national defense requirements, act of governmental authority, extraordinary failure of equipment or apparatus, inability to obtain electricity or other type of energy, raw material, labor, equipment or transportation, or other causes beyond Seller's reasonable control.  It is understood and agreed that settlement of strikes, lockouts and other labor disputes shall be entirely within the discretion of Seller and that nothing in the Agreement shall require the settlement of strikes, lockouts and labor disputes when such course is inadvisable in the sole discretion of Seller.



14) **EXPORT CONTROLS:** Buyer acknowledges that the System and related technology is subject to U.S. export controls and economic sanctions, which may include the International Traffic in Arms Regulations ("ITAR"), the Export Administration Regulations ("EAR") and regulations promulgated by the U.S. Department of the Treasury Office of Foreign Assets Control. Buyer further acknowledges that the re-export of the System and/or related technology to a third country or retransfer to an unapproved end user may require a license or other authorization from the Government of the United States. Such licenses or other authorizations may impose further restrictions on the reexport or retransfer of the System and/or related technology. U.S. law also restricts the reexport or retransfer of U.S.-origin goods, technology, or services to countries or persons subject to U.S. sanctions or embargoes.

Buyer shall, and agrees to, comply with all applicable U.S. export control and economic sanctions laws and regulations. It is the sole responsibility of Buyer to apply for and obtain any necessary licenses or other authorizations prior to any reexport or retransfer of the System and/or related technology. Seller makes no warranty that any such licenses or other authorizations will be granted, and shall have no liability for Buyer's inability to obtain such licenses or other authorization or for any violation by Buyer of any applicable export control and/or economic sanctions laws and regulations. Buyer will indemnify Seller and hold it harmless from any liability resulting from Buyer's violation of this provision or applicable export laws and regulations.

Notwithstanding any other provision in this Agreement, Seller shall have the right to terminate this Agreement immediately upon the determination by Seller, in Seller's sole discretion, that Buyer has breached, intends to breach, or insists upon breaching any of the provisions in the above clauses.

15) **CONFIDENTIALITY:** Other than in the performance of the terms of the Agreement, neither Buyer nor its agents, employees, or subcontractors shall use or disclose to any person or entity any confidential information of Seller (whether written, oral, electronic or other form) that is obtained or otherwise prepared or discovered in connection with this Agreement. Buyer agrees that all pricing, discounts, design drawings and technical information that Seller provides to Buyer and indicates in writing is the confidential information of Seller, are the confidential and proprietary information of Seller. The obligations under this section continue for five (5) years and survive the termination or expiration of any underlying agreement between the parties. The provisions of this section relating to use and disclosure shall not apply to any information that: (a) is or becomes generally available to the public other than as a result of a disclosure by Buyer under this Agreement; (b) becomes available to Buyer from a source other than Seller without breach of any obligation of confidentiality; (c) was independently developed by Buyer without violation of Seller's rights and without



reference to the confidential information, as evidenced by written records, maintained in the ordinary course of business by Buyer; (d) is used or disclosed with the prior written approval of Seller; (e) is information previously known to Buyer as evidenced by written records maintained by Buyer in the ordinary course of business, and not otherwise subject to any confidentiality restrictions; or (f) Buyer becomes legally compelled (by oral questions, interrogatories, requests for information or documents, subpoenas, investigative demands or similar process) to disclose. If Buyer becomes legally compelled (by oral questions, interrogatories, requests for information or documents, subpoenas, investigative demands or similar process) to disclose any of the confidential information, Buyer shall provide Seller with prompt written notice so that Seller may seek a protective order or other appropriate remedy or waive compliance with the provisions of this Agreement. If such protective order or other remedy is not obtained, or if Seller waives compliance with the provisions of this Agreement, Buyer shall furnish only that portion of the confidential information which Buyer is legally required to disclose and shall exercise its reasonable efforts to obtain reliable assurance that confidential treatment shall be accorded the confidential information.

16)  **GOVERNING LAW:**  This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois without reference to principles of conflict of laws. The UN Convention on Contracts for the International Sale of Goods shall not apply to the transaction represented hereby. The parties consent and submit to the jurisdiction and service of process of any state or federal court located in Cook County, Illinois.

17)  **SECURITY INTEREST:**  Buyer represents that the System is equipment to be used for business, and shall remain personal property. Buyer grants Seller a security interest in the System to secure the payment of the purchase price. Buyer will not sell, lease, transfer or encumber the System and will keep it free from any and all liens and security interests until Seller has been paid in full and shall execute any and all documents reasonably requested by Seller to protect such security interests.

18)  **MODIFICATION OF PROVISIONS:**  This Agreement cannot be modified except by agreement in writing signed by Buyer and Seller.

19)  **SEMI-ANNUAL MAINTENANCE CONTRACT:**  Buyer hereby agrees that Seller shall provide Buyer with semi-annual servicing of the System for as long as the System in active use. The semi-annual servicing shall include replacement parts and 2 engineers for one week for each semi-annual servicing of the System. Total cost of this service to Buyer



shall be $1000.00 per day per engineer and reimbursement of Seller's reasonable travel and accommodation costs related to the semi-annual servicing of the System. Such reimbursement shall be paid at Seller's actual costs for travel and accommodations, so long as such costs are reasonable. In the event that Buyer requests additional service assistance from Seller, such services shall be provided under the same terms set forth in this paragraph.

21)  MISCELLANEOUS:

a) Neither party may assign the Documentation or these Terms and Conditions, including without limitation any of its rights or obligations thereunder or hereunder, without the express written consent of the other party hereto; provided that each party may assign the Documentation and these Terms and Conditions, including without limitation any of its rights or obligations thereunder and hereunder, to any of its parents, subsidiaries or affiliates or to any third party which merges with that party or acquires all or substantially all of its business and assets or a substantial part of its assets or business relating to the Products without the other party's consent.

b) In the event of any legal proceeding between Seller and Buyer relating to the Documentation or these Standard Sales Terms and Conditions, neither party may claim the right to a trial by jury, and both parties waive any right they may have under applicable law or otherwise to a trial by jury.

c) In the event that any one or more provisions contained herein shall be held by a court of competent jurisdiction to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall remain in full force and effect, unless the revision materially changes the bargain.

d) Either party's failure to enforce, or either party's waiver of a breach of, any provision contained herein shall not constitute a waiver of any other breach or of such provision.

e) Seller reserves the right to correct clerical, arithmetical, or stenographic errors or omissions in the Documentation, quotations, order acknowledgments, invoices or other documents.

f) Any notice or communication required or permitted hereunder shall be in writing and shall be deemed received when personally delivered or three (3) business days after being sent by certified mail, postage prepaid, to a party at the address specified herein or in the Documentation, or at such other address as either party may from time to time designate to the other.



g) Each party agree that they will not use the other party's name(s), logo(s) or mark(s) in any public communication or press release, or for any other marketing or promotional purpose, without the other party's prior written consent.

h)Terms used in the Documentation and these Terms and Conditions that are defined by the Uniform Commercial Code of the State of Illinois shall have the meanings contained therein.


22)   **ENTIRE AGREEMENT:**  The Documentation, as signed by both parties, including the Standard Sales Terms and Conditions and any attachments referenced in the Documentation, constitute, with respect to the subject matter hereof, the complete and exclusive statement of the contract between Seller and Buyer (the "Agreement").   No waiver, consent, modification, amendment or change of the terms contained in the Documentation or these Terms and Conditions shall be binding unless made in writing and signed by Seller and Buyer.   Seller's failure to object to terms contained in any subsequent communication from Buyer (whether in a purchase order or other communication) will not be a waiver or modification of the terms set forth herein.

# Exhibit 3



Twitter, Inc. [US] | https://twitter.com/foliumbio/status/684829842798284800

Home    Moments    Notifications    Messages

Search Twitter

**Folium Biosciences**
@FoliumBio

We are excited to announce our partnership with Orochem - a leader in extraction and purification technology! wholehempcompany.com/whole-hemp-com

2:12 PM - 6 Jan 2016

Follow

Tweet your reply

**Trends for you**

#NetflixDeJam ☑ Promoted by Netflix US    #Empire    Lackey    #ConfessToSomethingStupid
#Cusp2017    #WorldTourismDay    Bill Murray    #ChicagoPD    #MarketingTechSmart    Justin
Timberlake

© 2017 Twitter   About   Help Center   Terms   Privacy policy   Cookies   Ads info

**Folium Biosciences**
@FoliumBio

Folium Biosciences is the Premier Grower,
Manufacturer & Supplier of
Phytocannabinoid-Rich Hemp Oil #PCR

📍 Colorado
🔗 foliumbiosciences.com
📅 Joined June 2015

© 2017 Twitter   About   Help Center   Terms
Privacy policy   Cookies   Ads info

Exhibit 4

**From:** Anil Oroskar
**Sent:** Wednesday, March 30, 2016 6:46 AM
**To:** Drew Le Bleu; Asha Oroskar; Ved Gulati; Chhavi Bhardwaj; Farid Adel; Pravin Ninawe
**Cc:** Anil Oroskar
**Subject:** RE: WHC Team Questions

Drew, Chhavi, Pravin and Farid:

Please make sure you tell WHC guys to talk to me regarding any questions related to CBD production. No
side discussions which can leak info.

Thanks...Anil

**From:** Drew Le Bleu
**Sent:** Tuesday, March 29, 2016 2:32 PM
**To:** Asha Oroskar; Anil Oroskar; Ved Gulati
**Subject:** WHC Team Questions

Hi all,

I just wanted to formally notify you, as discussed earlier,  that Brad continues to ask questions about
proprietary information. The things he asks about include the ████████ we are using, the specific
amounts of material being loaded at different points in the process and what columns they are being
loaded on, as well as asking for more details about the chromatography.

He is very direct with his questions. Myself, along with other staff members, have asked him to stop
multiple times.

Thanks and Regards,

Drew LeBleu

# Exhibit 5

**From:** Anil Oroskar
**Sent:** Friday, April 08, 2016 11:25 AM
**To:** Ved Gulati; Asha Oroskar; Drew Le Bleu; Chhavi Bhardwaj; Pravin Ninawe; Feng Peng; Sugandh Sood; Rahuljit Pal; David House
**Subject:** FW: Orochem's proprietary information remains confidential

**From:** Raj Gupta [mailto:raj@foliumbiosciences.com]
**Sent:** Friday, April 08, 2016 11:03 AM
**To:** Brad Jones <bradj@foliumbiosciences.com>; Zach Jones <zachj@foliumbiosciences.com>; Eric Fleming <ericf@foliumbiosciences.com>; Tracy Elder <tracye@foliumbiosciences.com>; Tomas Garbe <tomasg@foliumbiosciences.com>
**Subject:** Orochem's proprietary information remains confidential

Hi Folium Tech Ops team,

The foremost goal for us at Chicago is to help with production and subsequently with scale-up at Orochem. The ▆ has been put in operation and and the SMB will soon follow, as early as next week. That will mean higher throughput and busy schedules.

I would like you to focus on your unit operations, activation, ▆ wash, rotovaping, final product prep etc. Other unit ops, such as extraction, purification, polishing, and HPLC testing are best left to Orochem personnel. Any related information, if confidential, is off limits as well.

Please be aware that Folium and Orochem are exclusive partners and we appreciate their technology, patented or trade secrets, because we are the ultimate beneficiaries.
And let's just leave it at that. We do not need to know everything.

Regarding our need to create completed batch record, I am taking it up with them so confidentiality of certain technologies used in the process do not become an impediment to making it happen.

Thank you guys, appreciate all your hard work,

Raj

Exhibit 6

**From:** Pravin Ninawe <pravin@orochem.com>
**Sent:** Wednesday, June 15, 2016 8:02 PM
**To:** Raj Gupta
**Cc:** Brad Jones; Eric Fleming; Zach Jones
**Subject:** Re: Housekeeping

Hey Guys,
Please let me know how can I help? Kitchen,  Common restrooms, Hallways, stairs etc?
Thanks,
Pravin

On Jun 15, 2016, at 7:57 PM, Raj Gupta <raj@foliumbiosciences.com>wrote:

Thanks Brad, for the clean-up!

The vacuum downstairs is broken so I couldn't, will find a cheap one at WM.

On Jun 15, 2016 4:09 PM, "Raj Gupta" <raj@foliumbiosciences.com> wrote:
Hi Roomies,

Bad news, there were giant ants crawling all over the kitchen this morning, reminding me that may be we all have been slipping on cleanliness.

I can't preach what I cannot practice so I will take the first step:  I will vacuum the entire house and get those dust bunnies out.  However, I will leave your bedrooms alone.

I want you to take care of the kitchen and wet wipe the horizontal surfaces, not just today but as a way of life.

Let's be a bit more vigilant guys, otherwise Shiru will kick us out for squatting and bringing her property value down.

Raj

Exhibit 7

**From:** Pravin Ninawe <pravin.ninawe@gmail.com>
**Date:** June 28, 2017 at 5:21:46 PM CDT
**To:** Ranjana Gulati <ranjana@orochem.com>
**Subject: Re: Experience Letter**

Dear Ranjanaji,

I had told Dr Anil the name of the company over a phone when I called him to inform about my intention to resign. Maybe he forgot. The name is Batteries Plus LLC. Please let me know when should I expect to receive the letter?

Thanks,

Pravin

Exhibit 8

**From:** Ranjana Gulati
**Sent:** Wednesday, October 21, 2015 5:22 PM
**To:** Anil Oroskar; Asha Oroskar; Ved Gulati
**Subject:** Report



5. Gave the employment agreements to:
   Pravin Ninawe
   Sugandh Sood



Best Regards,

Ranjana Gulati
Office Manager

*Orochem Technologies Inc.*
*340 Shuman Blvd*
*Naperville IL 60563*
*Tel :- 630 210 8300*
*Fax:-630 210 8315*
www.orochem.com

This message contains confidential and proprietary information and is intended only for the individual named and may not be reproduced in whole or part unless authorized in writing by an authorized representative of Orochem Technologies. If you are not the named addressee, you should not disseminate, distribute or copy this email. Please notify the sender immediately by email if you have received this email by mistake and delete this email from your system.

# Exhibit 9

**From:** Brad Jones [bradj@foliumbiosciences.com]
**Sent:** Wednesday, April 19, 2017 4:11 PM
**To:** Marshall Underwood; Pravin Ninawe
**Subject:** ███████

https://www.█████████████████████████████████
████████████████████

Marshall,

Can you touch base with Pravin to identify two pumps with proper fittings... should be similar or same to the column connections so that we can maintain continuity throughout our equipment....

We need to get 2 of these pumps and ideally ██████ compatable.
--

Brad Jones
Director of Production
Technical Operations

Folium Biosciences
828 Wooten Road
Colorado Springs, CO 80915

+1 479-414-5236
bradj@foliumbiosciences.com
www.foliumbiosciences.com

Exhibit 10

**From:** ████████████████████████████
**Sent:** Thursday, June 08, 2017 1:26 PM
**To:** Brett bamesberger
**Cc:** Pravin Ninawe; Laura Hartman
**Subject:** ████████████████████████

Hello Brett,

Please see attached.

We currently have 7 of these in stock.

Thank you,

████████████████
████

████████████████████
████████████████████
████████████████████

████████████████████████████
████████████████████████
████████████████████

**From:** Brett bamesberger [mailto:brettb@foliumbiosciences.com]
**Sent:** Thursday, June 08, 2017 12:23 PM
**To:** ████████████
**Cc:** Pravin Ninawe; Laura Hartman
**Subject:** ████████████████████

Do you have

████████████████████████████████

████████████████████████ We need somthing wuth better thread retention.

Thx